**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW LEVESQUE,<br>Plaintiff, | COMPLAINT |
| | Civil Action No. ___________ |
| v. | |
| CSX TRANSPORTATION, INC.,<br>Defendant. | JURY TRIAL DEMANDED |

## COMPLAINT AND JURY DEMAND

Plaintiff Matthew Levesque, by and through undersigned counsel, brings this action against Defendant CSX Transportation, Inc. and alleges as follows:

## PARTIES

1. Plaintiff Matthew Levesque ("Mr. Levesque") is an adult individual who resides in the State of New York. At all times relevant to this Complaint, Mr. Levesque was employed by Defendant in Erie, Pennsylvania.

2. Mr. Levesque is a member of the United States Naval Reserve. He has served in the Naval Reserve since approximately June 2020.

3. Defendant CSX Transportation, Inc. ("CSX") is a Virginia corporation with its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a Class I freight railroad that operates throughout the eastern United States, including in Erie, Pennsylvania, where Mr. Levesque worked.

4. At all times relevant to this Complaint, CSX was an "employer" within the meaning of USERRA, 38 U.S.C. § 4303(4)(A).

5. At all times relevant to this Complaint, CSX was an "employer" within the meaning of the FMLA, 29 U.S.C. § 2611(4), employing far more than fifty employees.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Mr. Levesque's claims under USERRA pursuant to 38 U.S.C. § 4323(b)(1), which provides that an action against a private employer may be brought in any United States district court for any district in which the employer maintains a place of business.

7. This Court has subject matter jurisdiction over Mr. Levesque's claims under the FMLA pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

8. Venue is proper in this District because CSX maintains a place of business in Erie, Pennsylvania, which is within the Western District of Pennsylvania, and the events giving rise to this action occurred in Erie, Pennsylvania. 38 U.S.C. § 4323(c)(2); 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

9. Mr. Levesque worked for CSX for approximately ten years as a signal maintainer in the Erie, Pennsylvania area. He was a dedicated, experienced employee responsible for maintaining and inspecting railroad signal equipment across an assigned territory.

10. Mr. Levesque earned approximately $42 to $44 per hour, with an annual base salary of approximately $90,000 and an additional $30,000 to $40,000 per year in overtime compensation.

11. As a CSX employee, Mr. Levesque received significant employment benefits, including health insurance, a railroad retirement pension for both himself and his spouse, and eligibility for an employee stock purchase program.

12. Mr. Levesque joined the United States Naval Reserve in approximately June 2020. His service required him to attend periodic drill weekends and training periods, including a four-month training school beginning in approximately January 2021.

13. Mr. Levesque provided proper notice to CSX of his military service obligations, as required by USERRA.

14. Before his promotion to supervisor, Jared Fortner ("Fortner") was a signal maintainer who worked in a territory adjacent to Mr. Levesque's. When Mr. Levesque was absent for military drills or training, Fortner was required to cover Mr. Levesque's territory and trouble calls.

15. Beginning as early as January 2021, when Mr. Levesque departed for a four-month military training school, Fortner made comments expressing resentment toward Mr. Levesque's military absences, including statements to the effect of "I'm always having to cover your territory" and "I always have to cover your trouble calls."

16. Fortner was promoted to a supervisory position over Mr. Levesque in approximately October or November 2023. Mr. Levesque had also applied for this position and was, by all accounts, highly qualified for it. The hostile comments about Mr. Levesque's military service escalated after Fortner became his supervisor.

17. After his promotion, Fortner made repeated comments directed at Mr. Levesque regarding his military absences, including statements to the effect of: "It would be really nice to have an employee here who's here full-time"; that Mr. Levesque's absences for drill "puts a lot of extra work on everybody else" and "really increases their workload"; and remarks about how few full weeks Mr. Levesque had worked in a given year.

18. Another employee, Brandon Sweet, who took over Mr. Levesque's territory, also made comments in Fortner's presence about how few weeks Mr. Levesque had worked that year, and Fortner agreed with and affirmed those comments.

19. Fortner also expressed a belief that Mr. Levesque was "out to get him" and wanted Fortner's supervisory position. In a private conversation with Mr. Levesque in early February 2024, Fortner stated words to the effect that he felt he needed to "get you before you get me."

20. On information and belief, Fortner began printing and collecting Mr. Levesque's work records as early as February 2024 - months before the pretextual charges were brought - in an effort to build a paper trail to support Mr. Levesque's termination. The records submitted as evidence during Mr. Levesque's disciplinary hearing confirm that Fortner began compiling these records in February 2024.

21. Fortner had previously told Mr. Levesque that when CSX management wants to "get rid of a trouble employee," they start printing off paperwork and building a case against the employee so that, when they terminate the employee, they have a paper trail. Fortner then executed this exact playbook against Mr. Levesque.

22. In approximately late January 2024, Mr. Levesque began taking approved intermittent FMLA leave to care for his terminally ill father, who had been placed on home hospice.

23. Mr. Levesque took FMLA leave on a minimal basis - approximately one day per week - because Fortner's hostile comments about his absences made him feel pressured to limit his use of protected leave, even while his father was dying.

24. The hostile comments directed at Mr. Levesque about his absences conflated his military drill periods and his FMLA leave. Comments such as "you've only worked two full weeks this entire year" referenced both his drill absences and his FMLA days.

25. On at least one occasion, Mr. Levesque was denied an overtime shift. When Mr. Levesque informed CSX he was available and wanted to work the overtime shift, management told him that because of "what's going on" - a reference to his father's illness - he was "not reliable to be at work" and would not be included in the overtime rotation, despite Mr. Levesque's seniority entitling him to the shift.

26. In early May 2024, Mr. Levesque attended a Naval Reserve drill in Virginia.

27. During this drill period, Fortner called Mr. Levesque's local drill center in Buffalo, New York, and demanded to know Mr. Levesque's whereabouts, stating that he "didn't believe a word" Mr. Levesque was saying and was not sure Mr. Levesque was actually drilling.

28. When Mr. Levesque called Fortner to discuss this, Fortner told him that he had "a hard time believing" Mr. Levesque was actually drilling and that he did not "know if I believe a word you say anymore." Mr. Levesque offered to send a photograph of himself in uniform. Fortner declined but maintained his skepticism.

29. On or about May 5, 2024, Mr. Levesque contacted CSX's ethics hotline and HR department to report Fortner's discriminatory treatment related to his military service. Mr. Levesque submitted a formal complaint through both the telephone hotline and an online ethics submission portal. CSX's HR department assured Mr. Levesque that CSX maintained a "zero tolerance policy for retaliation."

30. Immediately after Mr. Levesque's HR complaint, the scrutiny of his work intensified. His work and trouble calls were subjected to heightened review. Other employees were tasked with going behind Mr. Levesque and double-checking his work.

31. A policy requiring employees to start and end their shifts at a specific headquarters location was selectively enforced against Mr. Levesque, adding approximately one hour to his

commute each way. Other employees were not required to comply with this policy. On multiple occasions, Mr. Levesque was the only employee present at headquarters at the start or end of a shift.

32. Mr. Levesque's lunch periods were scrutinized down to the minute, with management referencing GPS tracking to monitor the precise duration of his breaks.

33. On information and belief, Fortner's supervisor was aware of Mr. Levesque's ethics complaint and referenced it during a meeting, stating words to the effect that they needed to "get this figured out because I'm sure there's a case opened up on it somewhere."

34. On May 28, 2024 - approximately twenty-three days after Mr. Levesque filed his HR complaint - CSX suspended Mr. Levesque. CSX initially brought two charges against him. The following day, May 29, 2024, CSX tacked on two additional charges.

35. The four charges brought against Mr. Levesque were: (a) theft of fuel; (b) not having proper track protection; (c) falsifying test records; and (d) lying about a pending investigation. Each of these charges was pretextual.

36. CSX accused Mr. Levesque of stealing fuel he purchased for company generators. Mr. Levesque possesses text messages from Fortner himself instructing Mr. Levesque to purchase fuel for the generators. CSX's own generator logs confirm that generators were running at the relevant locations and required fuel. Evidence submitted at Mr. Levesque's disciplinary hearing, including generator user manuals documenting fuel consumption rates, demonstrated that the generators would have consumed all of the fuel Mr. Levesque purchased during their runtime.

37. CSX accused Mr. Levesque of not having proper track protection at a work location. Mr. Levesque had completed his Statement of Track Safety ("STOTS") form documenting that

he had proper sight distance - the only required form of track protection for that location and track speed - but had not filled in the time field. Fortner ripped the completed page out of Mr. Levesque's STOTS book and claimed Mr. Levesque never filled it out. During the disciplinary hearing, Fortner was forced to produce both the book and the ripped-out page, which had been scanned into the hearing record.

38. CSX accused Mr. Levesque of falsifying federal safety inspection records based on GPS data showing he was at certain locations for only brief periods on the dates he recorded completing inspections. However, it is common and well-known industry practice for maintainers to split inspections over multiple days, completing most of the work on one day and returning the next day to finish. CSX's electronic system only permits entry of a single "date of completion." During the disciplinary hearing, Fortner admitted he did not submit Mr. Levesque's complete GPS records and instead selectively chose which records to present. When asked whether other employees also split inspections over multiple days, Fortner claimed no one else did - a statement contradicted by common practice throughout CSX's signal department.

39. The "lying about a pending investigation" charge was circular, arising from Mr. Levesque's denial of the fuel theft allegation that he had already disproved.

40.The two additional charges brought on May 29, 2024 - one day after Mr. Levesque's suspension - were purportedly "discovered" on that date. However, the evidence Fortner submitted at the disciplinary hearing shows he began printing the underlying records in February 2024, months before the charges were supposedly discovered.

41. CSX conducted disciplinary hearings on July 1 and 2, 2024. Mr. Levesque presented evidence rebutting each charge. CSX terminated Mr. Levesque by letter dated July 16, 2024.

42. In a further example of disparate treatment: in approximately February 2024, shortly after Mr. Levesque returned from a drill period, Fortner wrote up Mr. Levesque for "lying" based on how Mr. Levesque described a routine trouble ticket. Another employee subsequently had the identical issue - and Fortner instructed that employee to describe it in the exact manner for which Mr. Levesque had been disciplined.

43. After Mr. Levesque filed his ethics complaint, CSX's HR representative, Erica McNair, told him CSX would investigate his complaint. When Mr. Levesque contacted HR to report that the retaliation was escalating, HR responded only that it would "look into it."

44. Despite Mr. Levesque's repeated requests for updates, HR provided no information about the status of the investigation. Approximately one week after CSX terminated Mr. Levesque, Erica McNair called him and informed him that CSX had concluded its investigation and "found no wrongdoing on the side of management." The investigation was closed.

45. On information and belief, CSX's ethics investigation was a sham designed to provide cover for the termination of an employee who had reported USERRA violations.

46. In a further example of disparate treatment, CSX treated a similarly situated, non-protected employee more favorably than Mr. Levesque in connection with nearly identical conduct. On information and belief, within approximately the past month, Marcus Smith, a signal technician based out of Cleveland, Ohio, was witnessed by CSX supervision skipping required steps during a safety inspection - conduct substantively similar to the "falsifying test records" charge that CSX used to terminate Mr. Levesque. Despite being observed committing the same category of misconduct for which Mr. Levesque was discharged, Smith was not charged with falsifying inspection records. He was instead issued a lesser disciplinary write-up for an observation test failure. Smith reported to the same supervisory chain as Mr. Levesque and

was subject to the same policies. This disparate treatment further demonstrates that the charges brought against Mr. Levesque were pretextual and that CSX applied its disciplinary policies in a discriminatory and retaliatory manner.

47. CSX's disparate treatment of Mr. Levesque extended to the fuel theft charge as well. On information and belief, during Mr. Levesque's suspension or shortly after his termination, Alan Mancuso, a fellow CSX employee, was observed by Fortner himself with personal fuel jugs in his company work truck - conduct directly analogous to the basis on which CSX pursued the fuel theft charges against Mr. Levesque. Despite Fortner's firsthand observation, Mancuso was not accused of theft and was not subjected to any disciplinary action. This further demonstrates that CSX's decision to charge and terminate Mr. Levesque for alleged fuel theft was pretextual and that CSX selectively enforced its policies against Mr. Levesque while allowing similarly situated, non-protected employees to engage in the same conduct without consequence.

48. Mr. Levesque was out of work from May 28, 2024, until approximately December 2024, a period of approximately seven months.

49. Mr. Levesque obtained new employment in December 2024 at a lower rate of compensation than he earned at CSX.

50. As a result of his termination, Mr. Levesque lost his railroad retirement pension - both his own pension and the spousal pension to which his wife would have been entitled. He also lost his health insurance coverage, eligibility for CSX's employee stock purchase program, and the opportunity to advance to a higher-paying position (approximately $50 per hour) that he would have obtained based on seniority.

51. Mr. Levesque's termination caused him significant emotional distress, including stress, difficulty sleeping, and strain on his marriage and family relationships. He was in therapy

prior to his termination and relied heavily on therapy in the months following it. The termination, which was based on charges of falsifying federal safety inspections and fuel theft, has damaged Mr. Levesque's professional reputation and impaired his ability to pursue certain career paths, including federal railroad safety positions and law enforcement.

**COUNT I**
**Discrimination in Violation of USERRA, 38 U.S.C. § 4311(a)**

52. Mr. Levesque incorporates by reference all preceding paragraphs as though fully set forth herein.

53. USERRA provides that "[a] person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation." 38 U.S.C. § 4311(a).

54. Mr. Levesque is a member of the United States Naval Reserve who performed service in a uniformed service throughout his employment at CSX.

55. CSX, acting through its supervisor Jared Fortner and others, denied Mr. Levesque retention in employment and benefits of employment on the basis of his membership in and performance of service in the Naval Reserve.

56. Mr. Levesque's military service was a substantial or motivating factor in CSX's decision to terminate his employment, as demonstrated by, among other things: (a) Fortner's repeated hostile comments directed at Mr. Levesque's military absences; (b) Fortner's call to Mr. Levesque's drill center to verify whether he was actually drilling; (c) Fortner's statement that he "didn't believe a word" Mr. Levesque was saying about his military service; (d) the pattern of

discipline following Mr. Levesque's return from drill periods; (e) Fortner's collection of records beginning months before the stated charges to build a pretextual case for termination; and (f) the pretextual nature of the charges themselves, each of which Mr. Levesque rebutted with documentary evidence.

57. CSX's conduct was willful within the meaning of 38 U.S.C. § 4323(d)(1)(C).

58. As a direct and proximate result of CSX's violations of USERRA, Mr. Levesque has suffered and continues to suffer lost wages, lost benefits including railroad retirement pensions and health insurance, lost earning capacity, and other damages.

## COUNT II
## Retaliation in Violation of USERRA, 38 U.S.C. § 4311(b)

59. Mr. Levesque incorporates by reference all preceding paragraphs as though fully set forth herein.

60. USERRA provides that "[a]n employer may not discriminate in employment against or take any adverse employment action against any person because such person . . . has taken an action to enforce a protection afforded any person under this chapter." 38 U.S.C. § 4311(b).

61. On or about May 5, 2024, Mr. Levesque took an action to enforce a protection afforded under USERRA by filing a complaint with CSX's ethics hotline and HR department regarding Fortner's discrimination against him based on his military service.

62. Within approximately twenty-three days of Mr. Levesque's protected activity, CSX suspended Mr. Levesque and initiated disciplinary charges against him. CSX terminated Mr. Levesque approximately seventy-two days after his protected activity.

63. Mr. Levesque's protected activity under USERRA was a substantial or motivating factor in CSX's decision to suspend and terminate him.

64. CSX's conduct was willful within the meaning of 38 U.S.C. § 4323(d)(1)(C).

65. As a direct and proximate result of CSX's retaliation, Mr. Levesque has suffered and continues to suffer lost wages, lost benefits, lost earning capacity, and other damages.

**COUNT III**
**Interference in Violation of the FMLA, 29 U.S.C. § 2615(a)(1)**

66. Mr. Levesque incorporates by reference all preceding paragraphs as though fully set forth herein.

67. The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1).

68. Mr. Levesque was an eligible employee within the meaning of the FMLA, 29 U.S.C. § 2611(2). He had been employed by CSX for approximately ten years and had worked far more than 1,250 hours in the twelve months preceding his leave.

69. CSX is a covered employer within the meaning of the FMLA, 29 U.S.C. § 2611(4).

70. Mr. Levesque was entitled to take FMLA leave to care for his terminally ill father, who was on home hospice. 29 U.S.C. § 2612(a)(1)(C).

71. CSX interfered with Mr. Levesque's FMLA rights by: (a) making hostile comments about his absences that discouraged him from exercising his full FMLA entitlement, causing him to limit his leave to approximately one day per week while his father was dying; (b) denying him an overtime shift on the basis that he was "not reliable" due to his father's illness; and (c) using his FMLA absences as a negative factor in the employment actions taken against him, including his termination.

72. As a direct and proximate result of CSX's interference with Mr. Levesque's FMLA rights, Mr. Levesque has suffered and continues to suffer lost wages, lost benefits, and other damages. 29 U.S.C. § 2617(a).

## COUNT IV
**Retaliation in Violation of the FMLA, 29 U.S.C. § 2615(a)(2)**

73. Mr. Levesque incorporates by reference all preceding paragraphs as though fully set forth herein.

74. The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2).

75. Mr. Levesque exercised his rights under the FMLA by taking approved intermittent FMLA leave beginning in approximately late January 2024.

76. CSX retaliated against Mr. Levesque for exercising his FMLA rights by subjecting him to heightened scrutiny, denying him overtime opportunities, and ultimately terminating his employment.

77. Mr. Levesque's exercise of FMLA-protected rights was a motivating factor in CSX's adverse employment actions against him.

78. CSX's violations of the FMLA were willful within the meaning of 29 U.S.C. § 2617(c)(2).

79. As a direct and proximate result of CSX's retaliation, Mr. Levesque has suffered and continues to suffer lost wages, lost benefits, and other damages. 29 U.S.C. § 2617(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Matthew Levesque respectfully requests that this Court enter judgment in his favor and against Defendant CSX Transportation, Inc. and award the following relief:

a. Lost wages, salary, and other compensation denied or lost as a result of CSX's violations, including back pay and front pay;

b. Lost employment benefits, including but not limited to railroad retirement pension benefits, spousal pension benefits, health insurance, and employee stock purchase program eligibility;

c. Liquidated damages in an amount equal to the back pay and lost benefits awarded, for CSX's willful violations of USERRA, pursuant to 38 U.S.C. § 4323(d)(1)(C);

d. Liquidated damages in an amount equal to the back pay and lost benefits awarded, for CSX's willful violations of the FMLA, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

e. Reasonable attorney's fees, expert witness fees, and costs of litigation, pursuant to 38 U.S.C. § 4323(h)(2) and 29 U.S.C. § 2617(a)(3);

f. Pre-judgment and post-judgment interest;

g. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Richard Haarbauer*
Richard Haarbauer, Esq.
PA. I.D. No. 333454
Andrew Lacy, Jr., Esq.
PA. I.D. # 321232
THE LACY EMPLOYMENT LAW FIRM
3675 Market Street, Suite 200
Philadelphia, PA 19104
(t) 412-301-3908
rickhaarbauer@lacylegal.com
andrew.lacy@lacylegal.com

*Attorneys for Plaintiff Matthew Levesque*

Dated: April 13, 2026